UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Luqris Thompson,<br><br>    Plaintiff<br><br>v.<br><br>Las Vegas Metropolitan Police Department, *et al.*,<br><br>    Defendants | 2:14-cv-01286-JAD-NJK<br><br>**Order Granting Motions for Summary Judgment and Closing Case**<br><br>[ECF Nos. 83, 84] |

After serving more than four years in prison for a robbery he did not commit, Luqris Thompson sued the Las Vegas Metropolitan Police Department and Detective George Libbey, asserting a 42 U.S.C. § 1983 claim based on an alleged *Brady* violation and a claim for intentional infliction of emotional distress ("IIED") under Nevada state law.[1]  Defendants now move for summary judgment on both of Thompson's claims.[2]  Because Thompson lacks evidence to show that he suffered a constitutional deprivation, defendants are entitled to summary judgment on his § 1983 claim.  And because Thompson also lacks evidence to show that defendants' conduct was extreme and outrageous or done with the intention of, or reckless disregard for, causing him severe emotional distress, defendants are also entitled to summary judgment on his IIED claim.  I therefore grant defendants' motions and direct the Clerk to close this case.[3]

**Background**

**A.    The robbery and investigation**

On the evening of April 9, 2007, two African American males robbed Renee Coppola as she exited her car in the parking structure at her Las Vegas apartment complex.  One of Coppola's

---

[1] ECF No. 63 (fifth-amended complaint).  Thompson initially sued a handful of other individuals, including the Clark County District Attorney's office and the Clark County Public Defender, and asserted six claims for relief.  ECF No. 1.

[2] ECF Nos. 83, 84.

[3] I find these motions suitable for disposition without oral argument.  L.R. 78-1.

neighbors, James McNeeley, heard Coppola screaming, directed his girlfriend to call 911, rushed to Coppola's aid, and pursued her assailants until the pair fled over a fence.[4] About ten minutes later, a Metro patrol officer and a crime-scene analyst arrived at the scene.[5] The officer took voluntary statements from Coppola and McNeely, and the crime-scene analyst gathered forensic evidence, including fingerprints, from Coppola's car.[6]

In a voluntary statement to police, Coppola described one of her attackers as a black male with light skin between 6'0–6'2" tall in his late 20's–early 30's with short hair and a diamond stick earing.[7] Coppola described her second attacker as around 5'10" tall wearing a black shirt and red and black hat.[8] McNeely described the men as African Americans in their early 20's or late teens standing approximately 5'0"–6'0" tall and weighing between 175–200 lbs.[9]

Several days after the robbery, Metro's robbery division assigned defendant Detective George Libbey to investigate Coppola's robbery. Detective Libbey interviewed Coppola and a security guard named Elven Bailey who was working the night of the robbery. Bailey told Detective Libbey that he thought he had seen two black males who matched the robbers' descriptions walking around the complex on the night of the robbery.[10] He recognized one of the men as a resident of unit 1195.[11] Detective Libbey visited unit 1195 and no one answered the door.[12] He then learned through the

---

[4] ECF No. 83-2 at 2–3, 26–34.

[5] *Id.* at 33.

[6] ECF No. 83-4 at 9.

[7] ECF No 83-2 at 3.

[8] *Id.*

[9] *Id.* at 26.

[10] ECF No. 83-4 at 2.

[11] *Id.*

[12] ECF No. 83-3 at 18.

apartment complex's management that Maria Thompson lived in the unit with her two sons.[13]

On April 19, 2007, Detective Libbey learned that some of the prints lifted from Coppola's car matched Jamey Manning,[14] but neither Coppola nor McNeeley was able to identify Manning in a photo line-up.[15] A few days after the unfruitful line-ups, Detective Libbey followed up with Bailey, who told him that he believed the residents of unit 1195 drove a purple Porsche.[16] Detective Libbey made a second attempt to contact unit 1195; no one answered.

On April 26, 2007, Bailey called Detective Libbey to report that he saw the suspect vehicle, which was in fact a Nissan 350z with temporary paper plates and not a Porsche, in the complex.[17] Detective Libbey was unable to respond at the time because he was working on another investigation. But the next day, Detective Libbey's partner was able to stop the Nissan near the complex, stating that the temporary paper plate was faded and not readable.[18] Libbey quickly responded to the scene and asked the driver, who identified himself as Luthaniel Carr, who lived in unit 1195; the driver answered that it was "Luqris Thomas."[19] Knowing that the last name of "Thomas" that Carr had given was most likely incorrect and armed with the information that the last name of the residents of unit 1195 was Thompson, Detective Libbey did a records check for Luqris Thompson.[20] The records check revealed that Thompson was a 19-year old black male adult standing 6'0" tall and weighing 170 pounds who resided at unit 1195.[21]

---

[13] *Id.*

[14] *Id.* at 38, ¶ 12.

[15] *Id.* at 38–39, ¶ 16–18.

[16] *Id.* at 39, ¶¶ 19–20.

[17] *Id.* at 39, ¶ 20; ECF No. 83-4 at 11.

[18] ECF No 83-3 at 39, ¶ 21; ECF No. 83-4 at 11.

[19] ECF No. 83-3 at 39, ¶ 22.

[20] ECF No. 83-4 at 12.

[21] *Id.*

Libbey then put Thompson's and Carr's DMV photos in separate line-ups and showed them to Coppola.[22] Coppola identified Thompson as one of her assailants in the first line-up with 90% certainty.[23] She did not identify anyone from the second line-up, which included a photo of Carr but no photo of Thompson.[24]

**B.    Thompson's arrest and conviction**

On May 11, 2007, Libbey prepared a declaration of arrest for Thompson and Manning (whose fingerprints were lifted from inside Coppola's car), detailing the investigation.[25] The Clark County District Attorney submitted the case to Las Vegas Justice Court, and the court issued a warrant for Thompson's arrest.[26] Detective Libbey never interviewed Thompson or Manning before their arrests[27] and did not take any further steps in Thompson's criminal case except to testify before the grand jury and at trial.[28] At a June 2007 preliminary hearing, the state-court judge found that there was sufficient evidence against Thompson and bound him over to Nevada's Eighth Judicial District Court for trial.[29] Two months later, a grand jury returned an indictment against Thompson and Manning, charging the pair with conspiracy to commit a crime, burglary, robbery, first-degree kidnapping, and attempted grand larceny.[30]

---

[22] ECF No. 83-3 at 39, ¶ 24.

[23] ECF No. 83-4 at 6–7.

[24] ECF No. 83-3 at 40, ¶ 27.

[25] ECF No. 83-4 at 9–12.

[26] *Id.* at 14–15.

[27] ECF No. 83-3 at 40, ¶ 30.

[28] *Id.* at 41, ¶ 36.

[29] ECF No. 83-4 at 14–15.

[30] ECF No. 83-9 at 3.

On November, 30, 2007, a jury convicted Thompson on all five charges.[31] Thompson was sentenced to 9–23 years in prison.[32] He unsuccessfully appealed his conviction to the Nevada Supreme Court.[33] On January 7, 2008, Manning pleaded guilty to the robbery and conspiracy charges. In his plea colloquy, Manning was asked if he and Thompson had committed the robbery together; Manning responded that they had.[34]

**C.     Thompson's exoneration**

More than four years after Thompson's conviction, in April 2012, Thompson's stepfather David Williams contacted Metro, stating that Manning (who had been paroled after serving four years) had reached out to him because he "found God" and wanted to help Thompson. Manning confessed to him that Thompson was not involved in the robbery.[35] This prompted Metro to investigate Thompson's possible innocence, noting that the only evidence against Thompson was Coppola's positive identification.[36] Metro detective Stout met with Manning, who implicated another man named "Dell" in the robbery[37] and stated that he was willing to take a polygraph and do whatever he could to exonerate Thompson.[38]

Detective Stout then spoke with Thompson's defense attorney Gerald Ciciliano.[39] Ciciliano confirmed that the only evidence the state had against Thompson was Coppola's identification and

---

[31] ECF No. 83-10 at 33.

[32] *Id.* at 37.

[33] ECF No. 83-11.

[34] *Id.* at 26–27.

[35] ECF No. 83-12 at 2.

[36] *Id.* at 3.

[37] *Id.*

[38] *Id.*

[39] *Id.*

indicated that Thompson steadfastly claimed he was innocent and refused to take a deal in the case.[40] Ciliano also stated that he had another client who overheard Manning say that he committed the robbery but did not know who Thompson was.[41] Ciciliano even stated that of the thousand or so defendants he had represented in his career, he thought that only two of them were innocent, and Thompson was one of them. But despite his belief in his client's innocence, Ciciliano said that he did not have Thompson testify because Thompson was a "druggy" and would not be believed.[42]

Finally, Detective Stout met with Thompson in prison. Thompson stated that at the time of trial, he asked Ciciliano to have his brother testify to his whereabouts the night of the robbery, to have Manning testify, to check the surveillance video at the Target store he was at the night of the robbery, which would have shown him buying a video with his friend Derrick Johnson, and to arrange for Thompson to take a polygraph. Ciciliano told him that none of the witnesses would help, that a polygraph would not be admissible, and that he could not get the video.[43]

Both Manning and Thompson passed polygraph tests.[44] Detective Stout was eventually able to make contact with "Dell," who was identified as Delaun Jackson, at his new residence in Iowa. Jackson was uncooperative until Detective Stout told him that the statute of limitations for the robbery had run, so Jackson could not be charged. Jackson then gave a detailed statement implicating himself and Manning in the robbery, and he volunteered to take a polygraph test.[45] Based on this information, Detective Stout requested that the crime lab compare Jackson's fingerprints to the unmatched fingerprints found in Coppola's car on the night of the robbery. The

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 5.

[44] *Id.*

[45] *Id.* at 7–8.

fingerprints matched.[46] On August 8, 2012, the state court granted the state's ex parte motion to vacate Thompson's judgment of conviction, and Thompson was finally released from prison.

**D.    Thompson's civil suit**

Almost two years after his release from prison, on August 6, 2014, Thompson filed suit.[47] Thompson, who was representing himself at that time, initially sued Ciciliano, Metro, the Clark County District Attorney's office, the D.A. in his case, and the Clark County Public Defender's Office.[48] He asserted six claims for relief: malpractice; negligence; obstruction; conspiracy; and subordination of perjury; two claims for due-process violations under § 1983; and IIED. Thompson's fifth (counseled) amended complaint names only Metro and Detective Libbey as defendants and asserts two claims for relief: a *Brady* claim under § 1983 and a state-law claim for IIED.[49]

Defendants separately move to dismiss both of Thompson's claims.[50] Detective Libbey argues that he is entitled to summary judgment because there was no constitutional violation and that the undisputed evidence shows that he did not withhold exculpatory evidence.[51] And even if Thompson could show there were a violation, Detective Libbey is entitled to summary judgment based on qualified immunity. Detective Libbey also contends that he is entitled to summary judgment on Thompson's IIED claim because (1) his conduct was not extreme or outrageous, (2) he did not act with the intention of, or reckless disregard for, causing Thompson severe emotional distress, and (3) Thompson cannot show that his actions caused Thompson's alleged emotional distress given the multiple intervening acts that ultimately lead to Thompson's conviction and sentence. Metro incorporates Detective Libbey's arguments into its motion and adds that, even if there were a constitutional deprivation, Thompson cannot show that it resulted from a Metro policy

---

[46] ECF No. 83-14 at 35.

[47] ECF No. 1.

[48] *Id.*

[49] ECF No. 63.

[50] ECF Nos. 83, 84.

[51] ECF No. 84 at 15.

or custom, as is required to impose municipal liability under § 1983.[52]

**Discussion**

**A.     Summary-judgment standards**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[53] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[54] If reasonable minds could differ on the material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[55]

If the moving party satisfies FRCP 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[56] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[57] The court only considers properly authenticated, admissible evidence in deciding a motion for summary judgment.[58]

---

[52] ECF No. 83.

[53] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[54] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[55] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[56] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[57] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

[58] Fed. R. Civ. P. 56(c); *Orr*, 285 F.3d at 773–74.

**B.      42 U.S.C. § 1983**

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."[59] To state a claim under § 1983, a plaintiff must allege that (1) a person acting under color of state law (2) violated a right secured to plaintiff by the Constitution or the laws of the United States.[60] Thompson invokes the due-process clause of the Fourteenth Amendment. He argues that defendants violated his due-process rights by "choosing not to obtain/or withholding" exculpatory evidence.[61] Though Thompson characterizes his § 1983 claim as civil *Brady* claim, it appears he may also be attempting to assert a failure-to-collect-or-preserve evidence claim under *Arizona v. Youngblood*. In an abundance of caution, I analyze his claim under both standards.

   **1.      Thompson's civil <u>Brady</u> claim fails as a matter of law because Thompson has failed to identify any exculpatory evidence that Detective Libbey knew about but failed to disclose.**

To prevail on a § 1983 claim based on a *Brady* violation, a plaintiff must prove both the underlying *Brady* violation—by showing that the prosecutor or police suppressed evidence favorable to the accused that was material either to guilt or to punishment—and that the officer acted with deliberate indifference to or reckless disregard for the plaintiff's rights or the truth.[62] Defendants argue that Thompson lacks evidence to show that Detective Libbey withheld exculpatory evidence in his possession.[63] Thompson responds with a laundry-list of evidence that Detective Libbey failed to *obtain*.

---

[59] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal citations and quotations omitted).

[60] *West v. Atkins*, 487 U.S. 42, 48–49 (1988).

[61] ECF No. 63 at 8.

[62] *Tennison v. City of San Francisco*, 570 F.3d 1078, 1088–98 (9th Cir. 2008).

[63] ECF No. 84 at 15. The bulk of defendants' oppositions are curiously devoted to defending against a Fourth Amendment-based false-arrest claim. ECF Nos. 83, 84. Thompson responds that defendants "mischaracterize" his claims as Fourth Amendment claims and unequivocally states that his § 1983 claim is based on a *Brady* violation. Because Thompson has expressly abandoned a Fourth Amendment-based § 1983 claim, I do not analyze his claim under that standard or defendants' arguments about the same.

Thompson's *Brady* theory fails as a matter of law because he does not allege or offer any evidence to show that Detective Libbey failed to disclose any exculpatory evidence to the prosecutor. Thompson takes issue with all of the allegedly exculpatory evidence that Detective Libbey did not "obtain" or "investigate,"[64] but he does not offer evidence showing that the detective knew about or possessed this evidence and failed to disclose it.  For example, Thompson argues that Detective Libbey violated his due-process rights by failing to obtain a surveillance tape, investigate his alibi, conduct and disclose the results of DNA testing, obtain a search warrant to determine whether Thompson had a diamond earing or check to see if he had a pierced ear, obtain evidence concerning whether Thompson had bite marks, or investigate a car accident that Thompson had been in the day before the robbery.[65]  These additional steps may have prevented Thompson's wrongful conviction and imprisonment and may have led police to the real perpetrator sooner, but none of these investigative shortcomings rises to the level of a *Brady* violation because Detective Libbey could not disclose evidence that he did not possess.  And even if Thompson could show that Detective Libbey possessed any material, exculpatory evidence, he does not argue—or offer any evidence to show—that Detective Libbey was deliberately indifferent to Thompson's rights under *Brady* and its progeny or to the truth.[66]

Thompson cites *Kyles v. Whitley* for the proposition that the state has "an affirmative obligation to obtain *Brady* material and provide it to a criminal defendant,"[67] but Thompson overreads *Kyles*.  In *Kyles*, the United States Supreme Court held that "the individual prosecutor has a duty to learn of any favorable evidence *known* to others acting on the government's behalf in [the

---

[64] ECF No. 89 at 11.

[65] *Id.*

[66] Though Thompson's counseled opposition correctly recites the elements of a § 1983 claim based on a *Brady* violation, including the deliberate-indifference requirement, he never addresses this requirement. ECF No. 89 at 9–10.  Thompson also incorrectly cites to the Nevada standard for materiality for this federal-law claim. *Id.* at 11.

[67] ECF No. 89 at 9 (citing *Kyles v. Whitley*, 514 U.S. 419 (1996)).

particular case], including police."[68]  *Kyles* thus imposes an affirmative obligation on the state to obtain exculpatory evidence known to others working on its behalf, including the police; it does not create an affirmative duty on law enforcement to gather evidence that police do not know about or evidence with an unknown exculpatory value.

Because Thompson has not identified a constitutional deprivation based on law enforcement's failure to disclose material, exculpatory evidence, both defendants are entitled to summary judgment on his § 1983 claim to the extent it is based on a *Brady* violation.

### 2. Thompson's <u>Youngblood</u> theory fails because he lacks evidence to show bad faith.

Even if I generously construe Thompson's § 1983 theory as one arising under *Arizona v. Youngblood,* defendants are still entitled to summary judgment.  A police officer's failure to preserve or collect potentially exculpatory evidence violates an accused's due-process rights only if the officer acted in bad faith when he failed to collect or preserve it.[69]  "The presence or absence of bad faith . . . turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."[70]  To show bad faith, a plaintiff must offer "specific, nonconclusory factual allegations that establish improper motive."[71]

Thompson does not allege or offer any evidence to show that Detective Libbey knew that the evidence he cites, i.e. the surveillance tape, etc., even existed—let alone that it was exculpatory—when he failed to collect and preserve it.  And the record shows that Detective Libbey and Metro did not know about the evidence that Thompson complains about or its exculpatory value.  For example, Thompson told police during the post-conviction investigation that he asked Ciciliano to pull the surveillance video from Target and to investigate his alibi and that Ciciliano failed to do

---

[68] *Kyles*, 514 U.S. at 437 (emphasis added).

[69] *Cunningham v. City of Wenatchee*, 345 F.3d 802, 81 (9th Cir. 2003).

[70] *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988); *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013).

[71] *Cunningham*, 345 F.3d at 812 (internal citation omitted).

so.[72] Ciciliano told police that he tried to obtain the surveillance video but was unsuccessful,[73] so it is unclear whether the tape existed and whether it would have been exculpatory, i.e. whether it would have shown Thompson at Target during the relevant time frame. There is also no evidence to show that police knew about or investigated Thompson's alibi until during the post-conviction investigation *after* Thompson told Detective Stout about his alibi and complained that Ciciliano had failed to investigate or put on evidence to support it.[74] In short, Thompson offers no "specific, nonclusory" facts to establish improper motive. Because Thompson has not identified any exculpatory evidence that law enforcement failed to gather or preserve in bad faith, defendants are also entitled to summary judgment on Thompson's § 1983 claim to the extent it can be construed as a *Youngblood* violation.

Because Thompson lacks evidence to show that he suffered any constitutional deprivation under *Brady*, *Youngblood*, or otherwise, both defendants are entitled to summary judgment on his § 1983 claim. And because Thompson has not identified a constitutional deprivation, I need not—and do not—reach defendants' other arguments.

**C.    Defendants are also entitled to summary judgment on Thompson's IIED claim.**

To prevail on a claim for intentional infliction of emotional distress (IIED) under Nevada law, a plaintiff must show (1) extreme and outrageous conduct by the defendant with either the intention of, or reckless disregard for, causing plaintiff emotional distress, (2) plaintiff suffered severe or extreme emotional distress, and (3) actual or proximate causation.[75]

Defendants argue that they are entitled to summary judgment on Thompson's IIED claim because he lacks evidence to show that defendants engaged in extreme or outrageous conduct with the intention of, or reckless disregard for, causing him severe emotional distress or that defendants' conduct caused his alleged severe emotional distress. Thompson does not offer a single cite to the

---

[72] ECF No. 83-12 at 2.

[73] *Id.*

[74] *Id.* at 4–5.

[75] *Olivero v. Lowe*, 995 P.2d 1012, 1025 (Nev. 2000).

1  record in support of his IIED claim.[76] Though he claims that he suffered "severe emotional,
2  psychological, and physical injuries, mental pain and suffering, and emotional distress" as a result of
3  defendants' actions, he offers no evidence to back up his assertions. In his half-page response to
4  defendants' IIED arguments, Thompson conclusorily argues that "a reasonable juror could determine
5  that Defendant Libbey intentionally and recklessly inflicted emotional distress on [Thompson] by not
6  disclosing the exculpatory evidence [that] the Constitution mandates he disclose."[77] As explained
7  above, Thompson has not identified any exculpatory evidence in Detective Libbey's possession that
8  he failed to disclose. Even if he had, a *Brady* violation contains no intent requirement,[78] so it does
9  not necessarily follow that a police officer who fails to comply with *Brady*'s disclosure requirements
10 acted with the intention of or reckless disregard for causing the criminal defendant severe emotional
11 distress. Because Thompson lacks evidence to show that Detective Libbey or Metro acted with the
12 requisite intent, that their conduct was extreme or outrageous, or that their conduct caused him
13 severe emotional distress, defendants are also entitled to summary judgment on Thompson's IIED
14 claim.

**Conclusion**

Accordingly, with good cause appearing and no reason to delay, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that **defendants' motions for summary judgment [ECF Nos. 83, 84] are GRANTED**.

The Clerk of Court is directed to enter judgment for defendants and against Thompson and to CLOSE THIS CASE.

Dated June 29th 2016

_____
Jennifer A. Dorsey
United States District Judge

---

[76] ECF No. 16.

[77] ECF No. 89 at 16.

[78] "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).